## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| SONDRA B. HALL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. Action No. 10-379-CJB |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Gary L. Smith, Newark, Delaware, Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, Delaware; Patricia A. Stewart, Special Assistant United States Attorney; Eric P. Kressman, Regional Chief Counsel and Stephen M. Ball, Assistant Regional Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

## MEMORANDUM OPINION

January 18, 2012
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, U.S. Magistrate Judge**

Plaintiff Sondra B. Hall ("Hall") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("the Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Hall and the Commissioner. (D.I. 15, 19) Hall asks the Court to remand this matter to the Commissioner for payment of benefits to her. (D.I. 18 at 19)[1] The Commissioner opposes this motion and requests that the Court affirm his decision. (D.I. 19 at 1) For the reasons set forth below, Hall's motion for summary judgment will be DENIED and the Commissioner's motion for summary judgment will be GRANTED.

## I. BACKGROUND

### A. Procedural History

Hall filed an application for DIB with the Social Security Administration on October 3, 2007, alleging disability beginning on September 1, 2005. (D.I. 12 (hereinafter "Tr.") at 109, 114) Hall subsequently amended the onset of her disability to January 1, 2002. (*Id.* at 116) Her claimed period of disability runs through December 31, 2006, the date she was last insured for disability benefits. (D.I. 18 at 3)

Hall's application was denied initially on March 18, 2008, and was again denied on

---

[1]     Hall's Opening Brief, located at D.I. 18 on the Court's electronic docket, is unpaginated. Citations to that document refer to the page numbers generated when accessing the brief on the Court's docket.

reconsideration on August 20, 2008. (Tr. at 72, 77) Hall then submitted a request for an appeal before an administrative law judge ("ALJ"). (*Id.* at 83–84) On May 28, 2009, ALJ Melvin D. Benitz held a hearing on Hall's appeal. (*Id.* at 27–67) Hall, who was represented by counsel, testified at the hearing, as did a vocational expert. (*Id.*) On September 8, 2009, the ALJ issued a decision confirming the denial of benefits to Hall. (*Id.* at 9–26) On March 12, 2010, the Appeals Council denied Hall's request for review. (*Id.* at 1–3) Thus, the ALJ's decision denying DIB became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On May 6, 2010, Hall filed a Complaint seeking judicial review of the ALJ's decision of September 8, 2009. (D.I. 2) On January 28, 2011, Hall moved for summary judgment. (D.I. 15) The Commissioner opposed Hall's motion and filed a cross-motion for summary judgment on March 16, 2011. (D.I. 19) The District Court then entered an Order on August 29, 2011, referring this case to me to hear and resolve all pretrial matters. (D.I. 22) On September 21, 2011, the parties consented to my jurisdiction to conduct all proceedings in this case. (D.I. 24)

## B.    Factual Background

At the time she filed her DIB application in 2007, Hall was fifty-seven years old. (Tr. at 109) She is a high school graduate and has past relevant work experience as a bookkeeper, a retail sales clerk for a furniture store, and an automobile salesperson. (*Id.* at 31, 52, 146, 159, 199) Hall claims to have been disabled since January 1, 2002, roughly four months before she left her position at the furniture store. (*Id.* at 159) Hall lives with her husband, who works as a parts driver for a car dealership. (*Id.* at 30, 150) Since the mid-1970s, Hall has smoked at least a pack of cigarettes per day. (*Id.* at 46, 221, 314, 469)

2

## 1. Plaintiff's Medical History, Treatment, and Condition

On June 2, 2004,[2] Hall underwent a total body scan. (Tr. at 221) The examining physician, Dr. Richard Sindler, made a number of findings based upon the scan. (*Id.* at 221–22) Dr. Sindler observed Barrett's tissue in the esophagus, numerous small cysts in the lungs which were consistent with centrilobular emphysema, calcification in the left coronary artery region, and a small hiatus hernia. (*Id.* at 221) Dr. Sindler found that Hall's heart was normal in size and shape, and that there was no active disease in the lungs. (*Id.*) Dr. Sindler also observed calcification in the iliac arteries and in the left femoral artery bilaterally in the groin. (*Id.* at 222) The scan further showed degenerative disc disease at L5-S1, and calcification in the lower thoracic area. (*Id.*)

On January 31, 2005, Hall was seen by Prashant Shukla, M.D., at Bayside Internal Medicine. (Tr. at 408–09) During her first examination by Dr. Shukla, Hall complained of chest pain and difficulty walking, which she first noticed in May 2004 when walking to her daughter's college graduation. (*Id.* at 394, 408) At that point, Hall's weight was 204 pounds. (*Id.*) Dr. Shukla referred Hall to a cardiologist, Niteen Milak, M.D., F.A.C.C., of MidAtlantic Cardiovascular in Maryland. (*Id.* at 396)

On February 9, 2005, Dr. Milak treated Hall for chest pain, which Hall stated had been affecting her for roughly one and a half years. (Tr. at 396–97) Hall noted that she lived in a split-level home, and that when she walked up the steps, she experienced a heaviness and

---

[2]     Although the Transcript contains medical records from as early as 1992 (*see, e.g.*, Tr. at 200–02), neither party has addressed Hall's medical records pre-dating June 2, 2004. (D.I. 18 at 3; D.I. 20 at 5) Similarly, neither party addresses Hall's medical records after December 5, 2006, (D.I. 18 at 8–9; D.I. 20 at 8), although the ALJ's decision does reference certain post-2006 medical evidence, which is discussed herein (Tr. 15–16).

squeezing sensation in her chest, radiating to her left arm. (*Id.* at 396) She also complained of some shortness of breath on exertion, which Hall thought might be due to emphysema. (*Id.*) Dr. Milak diagnosed her with unstable angina pectoris, and prescribed nitroglycerin and early cardiac catheterization. (*Id.* at 397)

Two days later, on February 11, 2005, Hall was seen at St. Joseph Medical Center in Towson, Maryland, by John Wang, M.D., and complained of chest pain. (Tr. at 224–25) She had a positive stress test and underwent catheterization with stent placement in the left circumflex coronary artery, which had a mid 80% narrowing. (*Id.*) Hall's left anterior descending coronary artery was described as a very tortuous vessel that was diffusely diseased with serial 20-30% narrowing. (*Id.* at 224)

On March 9, 2005, Dr. Milak saw Hall for a follow-up on the catheterization procedure. (Tr. at 394) Dr. Milak noted that Hall was doing "much better" after catheterization, and was no longer having chest pain or shortness of breath. (*Id.*) Dr. Milak stated that Hall was scheduled to have a vocal cord biopsy, which occurred in May 2005. (*Id.* at 278, 394)

On March 28, 2005, Hall had x-rays taken of her right hand, after complaining of pain. No significant bony or articular abnormalities were observed, and a handwritten notation on the imaging report indicates that the x-ray was normal. (Tr. at 311)

On August 30, 2005, Hall returned to Dr. Shukla, at Bayside Internal Medicine, and complained of foot, knee, hip, and back pain. (Tr. at 405) Her weight was still at 204 pounds. (*Id.*) Hall noted that she experienced general stiffness and ankle swelling in the morning, although she further stated that this condition typically improved over the course of the day. (*Id.*)

On September 13, 2005, Hall had x-rays of the knees, pelvis, hips, wrists, feet, and ankles

4

due to complaints of pain. (Tr. at 426–30) The x-rays from the right knee, hips, left wrist, feet, and ankles were all normal. (*Id*. at 426–27) The left knee x-rays showed possible trace suprapatellar bursa effusion, but were otherwise negative, while the right wrist x-rays showed traces of small suture scars in the soft tissues overlying the proximal metacarpals, but were otherwise negative. (*Id*.) None of the x-rays showed evidence of fracture, dislocation, or a foreign body. (*Id*.)

On September 19, 2005, Hall returned to Bayside Internal Medicine for a follow-up. Hall stated that she was in constant pain in her hips, knees, and feet, which she described as feeling as though her "bones are being crushed." (Tr. at 404) However, the musculoskeletal examination was "normal" for all categories, including wrists, fingers, back, hips, and knees. (*Id*.) Hall's weight was again 204 pounds at this visit. Hall was diagnosed with "generalized arthalgia." (*Id*.) Two days later, on September 21, 2005, Hall was examined by John C. Gordon, M.D., at Eastern Sports Medicine and Orthopaedic Center in Maryland. (*Id*. at 309) Hall made similar complaints of pain to Dr. Gordon, who noted that Hall had "absolutely normal x-rays," a full range of motion in her shoulders, wrist, elbows, and hips, "no problems with the knees," and a "negative straight leg raising." (*Id*.) Dr. Gordon stated that "most of [Hall's] problem is generalized muscular achiness." (*Id*.)

On October 13, 2005, Hall was seen by Jason Birnbaum, M.D., on referral from Dr. Shulka for evaluation of shortness of breath and chronic obstructive pulmonary disease ("COPD"). (Tr. at 468–70) Dr. Birnbaum noted Hall's complaints of shortness of breath when walking across a parking lot or climbing stairs, and chronic pain. (*Id*. at 468–69) Dr. Birnbaum indicated that Hall's COPD was "moderate-to-severe," and prescribed Spiriva and Advair, which

5

he believed would cause a "significant improvement." (*Id.* at 470) On that same date, Dr. Birnbaum ordered a series of pulmonary function tests, for which the results were generally "within normal limits." (*Id.* at 472) Also on October 13, 2005, Hall underwent a chest x-ray, which showed that the cardiomediastinal structures and pulmonary vasculature were within normal limits, that the lungs were clear without infiltrate, pulmonary edema or mass, and that no active disease was evident. Dr. Birnbaum's handwritten notes indicate that the chest x-ray "look[ed] good." (*Id.* at 310)

On February 9, 2006, Hall was seen by Mark D. Noar, M.D., for a follow-up regarding her prior diagnosis of Barrett's esophagus. Dr. Noar observed that Hall was in "no acute distress" and had "no chest pain, edema, orthopnea, [or] dyspnea." (Tr. at 314) He also noted a "very minimal wheeze in her right lung base," during an otherwise clear lung examination. (*Id.* at 315)

On March 16, 2006, Hall was seen at the Upper Chesapeake Medical Center Emergency Room for back, hand, and foot pain. (Tr. at 344) Hall was examined and was later deemed stable for discharge. (*Id.* at 346)

On April 4, 2006, Dr. Birnbaum saw Hall for a follow-up regarding her COPD, which he described as "moderate." (Tr. at 467) Hall said that she had "noticed some improvement" since beginning to take Spiriva and Advair. (*Id.*)

Hall's chest pain necessitated a trip to the emergency room at Upper Chesapeake Medical Center on June 25, 2006. Dr. Shukla referred Hall to the emergency room after Hall reported having felt a squeezing pressure in her chest for an hour, which also caused a sensation of squeezing in the lower part of her throat that was worse with exertion. (Tr. at 361, 364) This

6

episode of pain had apparently begun on the previous day when Hall was shopping; Hall indicated that prior to that day, she had been well. (*Id*. at 364) Her blood pressure was elevated, and after a positive enzyme test, Hall was "qualified to have myocardial infarction," more commonly known as a heart attack. (*Id*. at 361) The emergency room admission records note Hall's history of tobacco use, depression, hypertension, hyperlipidemia, and "possible COPD." (*Id*.) After receiving nitroglycerin and morphine, Hall's pain essentially resolved, leading to only a lingering level of pain of 1 on a scale of 10. (*Id*. at 364) Hall was referred for catheterization on June 26, 2006.

On June 26, 2006, Hall was transferred to St. Joseph Medical Center, where cardiac catheterization showed an 80% obstruction in the LAD coronary artery. (Tr. at 376) This blockage was reduced to 0% with stenting. (*Id*. at 376, 383) During examination, Hall indicated that she could walk one block, that she was able to walk around a supermarket leaning on the cart, and that her exertional tolerance had been very slowly declining. (*Id*. at 378) Following stenting, Hall suffered from recurrent chest pain and developed hematuria, hemoptysis, epistaxis, and slowly accumulating large ecchymoses in both upper extremities. (*Id*. at 376) By June 29, 2006, her symptoms subsided, and her bleeding stopped. (*Id*.)

On September 11, 2006, Hall was seen by Jill S. Ratain, M.D., at Johns Hopkins Medicine, on referral from Dr. Shukla for polyarthralgias with episodic redness and swelling in multiple joints. (Tr. at 435) Hall noted that she has had discomfort at the base of her left thumb, and intermittent swelling and redness with the pain. Hall reported that "the pain [was] not daily, and she ha[d] no morning stiffness." (*Id*.) On that day, she "rate[d] her pain at 2/10 with discomfort at the left thumb," and noted that her last redness and swelling occurred roughly two

and a half weeks prior to that visit. (*Id.*) She further reported that she "intermittently . . . ha[d] difficulty turning the ignition in the car or even turning on a light switch," and that "[a]t times, she ha[d] difficulty curling her fingers." (*Id.*) Although it was noted that she fatigues easily, Hall stated that "[h]er fatigue ha[d] improved recently since being treated for coronary artery disease in the last few months," and that she had lost about 20 pounds over the previous year. (*Id.* at 436) Dr. Ratain determined that Hall's physical examination supported a diagnosis of osteoarthritis over the knees and mild changes over the hands, noting that she had episodic redness, pain, and swelling over her small joints of the hands and wrists. (*Id.*) Dr. Ratain prescribed Trilisate, and discussed occupational and physical therapy for pain relief modalities to the hands, as well as the potential benefits from a hot paraffin bath for use at home. (*Id.*)

On December 5, 2006, Dr. Ratain saw Hall for a follow-up visit "for symptoms of polyarthritis that have not been well-characterized." (Tr. at 432) Hall rated her pain "at 2 out of 10." (*Id.*) Hall noted that she had been experiencing severe knee pain which made it painful to sit, some aching in her hip and pain over the wrists and in the base of her thumbs bilaterally. (*Id.*) Although Hall described that day as a "good day," she reported that she had 3–4 days when she could not move. (*Id.*) She reported no morning stiffness, and had been taking the prescribed Trilisate only intermittently. (*Id.*) The most recent x-rays from Hall showed osteoarthritis in the first carpometacarpal ("CMC") joint of the hand bilaterally. (*Id.*) Dr. Ratain performed a musculoskeletal examination, and determined that her hands were tender, with very minimal bony enlargement of the first CMC. (*Id.*) Her wrists showed good range of motion with no pain or swelling; her shoulders, neck, spine, and hips were unremarkable except for some tenderness; her knees showed good movement; and her ankles were unremarkable. (*Id.*) Dr. Ratain

8

diagnosed osteoarthritis of the hands and knees, with no evidence of inflammatory process, psoriatic arthritis, or rheumatoid arthritis. (*Id.* at 433) Dr. Ratain had previously referred Hall to occupational and physical therapy, but Hall chose not to go; Dr. Ratain again suggested this therapy. (*Id.*)

On June 5, 2007, Dr. Birnbaum examined Hall. During this examination, Hall reported that she continued to smoke a pack and a half of cigarettes per day, but that her symptoms were stable, and that she was not experiencing any pain. (Tr. at 463) Upon examination, Dr. Birnbaum found only mild COPD, which was clinically stable, which led him to discontinue Advair, one of the medications that Hall had been taking. (*Id.* at 464)

On November 1, 2007, as part of the process for applying for DIB, Hall completed a Function Report. (Tr. at 150–58) Hall described her daily activities as including watching television, talking on the phone, fixing lunch, dusting and cleaning every other day, and taking occasional walks to get the mail. (*Id.* at 150) She also reported that "there are more bad days and nights than good," that it is more painful to sit or stand, than to lie down, and that her pain makes it "almost impossible to sleep." (*Id.* at 151) Hall noted that she "[could not] use hands and wrist due to joint pain and [could not] stand long enough [to prepare meals] due to back, hip, and feet pain." (*Id.* at 153) She reported that she went shopping with her husband 2–3 times per month, and that she was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.* at 154)

On November 2, 2007, as part of the process for applying for DIB, Hall completed a Pain Questionnaire. (Tr. at 194–95) In that document, Hall stated that she was in constant but variable pain in her back, knees, hips, hands, wrist, feet, and neck, with aching and intermittent

9

inflammation. (*Id.* at 194) She noted that she had gained weight due to inactivity and again described how her pain had caused her to severely limit her activities and caused significant difficulty with sleeping. (*Id.* at 195)

On January 29, 2008, Vinod K. Kataria, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Hall. (Tr. at 453–58) Dr. Kataria determined that Hall could perform sedentary work with some postural and environmental restrictions. (*Id.* at 454, 456–57) Dr. Kataria noted that there was a lack of significant findings in the record, and that, in his view, Hall was partially credible. (*Id.* at 455)

On June 5, 2008, Hall underwent a dobutamine stress gated myocardial perfusion study.[3] (Tr. at 516–17) Hall had a "probably normal myocardial perfusion scan," and "[s]mall reversible defects which are limited to focal areas of the anterior and interior walls." (*Id.* at 517)

On November 4, 2008, William D. Hakkarinen, M.D., a state agency physician, reviewed the record evidence. Dr. Hakkarinen opined that Hall could perform light work with some postural and environmental restrictions. (Tr. at 491–98)[4]

## 2. The Administrative Hearing

At an administrative hearing on May 28, 2009, the ALJ heard the testimony of Hall and V. Anthony ("Tony") Malansen, an impartial vocational expert. (Tr. at 27–67)

---

[3]     A dobutamine stress test is used in people who are unable to exercise, and involves administering a drug to make the heart respond as though the person is exercising, so as to assess how the heart responds to stress. *See, e.g.*, http://www.webmd.com/heart-disease/guide/stress-test--(dupe), last visited Jan. 11, 2012.

[4]     In all, four state agency medical experts reviewed the record evidence. Among those were two state agency psychologists, who reviewed the record during the relevant period, and concluded that there was insufficient evidence to assess the severity of Hall's alleged depression and anxiety. (Tr. at 452, 489)

10

### a.  Ms. Hall's Testimony

Hall testified that although she had health problems for the past 20 years, she identified January 1, 2002, as the date on which she was first disabled because that was when she began having arthritis pain affecting her everyday life. (Tr. at 31–32) Hall said that she had three different types of arthritis: inflammatory arthritis, osteoarthritis, and arthritis related to psoriasis. (*Id.* at 36) The arthritis affected her fingers, wrists, knees, hips, and back. (*Id.* at 48) The pain in her wrist and fingers was also exacerbated by a prior surgery, which had caused difficulty in gripping things, though Hall would "just deal with it." (*Id.* at 50) She stated that by 2005, her arthritis had worsened, and that she moved from a split-level home in Maryland to a single-level home in Delaware in part because she reached a point where she could no longer ascend or descend the stairs in her Maryland home. (*Id.* at 33)

Hall also testified that she experienced chest pain for several years, which produced a squeezing feeling in her chest when she would go up steps or exert herself. (Tr. at 31) She described her heart catheterization procedure from 2005, in which she received a stent. (*Id.* at 32–33) After she underwent one of her stenting procedures, Hall was prescribed Plavix, which led to a number of adverse side effects, including vomiting, diarrhea, and flu-like symptoms. (*Id.* at 33–34) Hall stated that she had two heart attacks in mid-2006, just before she moved to Delaware. (*Id.*)

Hall further testified that at some point prior to 2007, she was having angina attacks "real often, at least probably three times a week, four times a week, sometimes twice in one day. But they kept saying that it was anxiety." (Tr. at 37) She took nitroglycerin tablets to combat these attacks, which would help. (*Id.*) Whether due to the angina or her other ailments, Hall reiterated

11

that she would get a heavy feeling in her chest that affected her breathing. (*Id*. at 38) Hall

identified 1999 as the first time that she started noticing angina. (*Id*. at 45) She also noted that

she was diagnosed with emphysema and moderate to severe COPD. (*Id*. at 35)

Hall testified that she spent about half of every day between 8:00 a.m. and 4:00 p.m. lying

down, and the bulk of the remainder in a recliner with her legs elevated. (Tr. at 39) Hall stated

that she spent roughly one hour per day standing and that her joint pain produced a "crunching"

when she tried to bend her knees. (*Id*. at 40–41) She testified that she had great difficulty

sleeping, and that she was often up during the night with diarrhea and frequent urination. (*Id*.)

She had been taking more than a dozen medications since 2006. (*Id*. at 47)

Upon examination by the ALJ, Hall testified that she originally had filed for DIB in

Maryland in 2005, and then she filed again in Delaware in 2007. (Tr. at 42) She also described

her last job in furniture sales as one where she was usually standing and walking around the

showroom. (*Id*. at 44) She stated that prior to 2007, she could lift 10 pounds without strain. (*Id*.

at 47) She also said that prior to that year, she could stand for about a half hour at a time and

could walk about a half block at a time so long as she rested during the walk. (*Id*. at 48) Prior to

2007, she could sit for about an hour-and-a-half without having to get up and move around, so

long as she relocated in her seat. (*Id*. at 49)

### b.    The Vocational Expert's Testimony

Vocational expert Tony Malansen testified in person at the hearing. He noted that Hall

had previously worked as a bookkeeper, which was sedentary work that was "skilled at SVP

12

six."[5] (Tr. at 52) Malansen further indicated that Hall had worked two previous jobs (as a retail

sales clerk and in auto sales) that were light work, at SVP level five. (*Id.*) He explained that

there were many transferable skills Hall had obtained in these jobs that would be applicable to

other potential jobs. (*Id.* at 54)

The ALJ asked Malansen to consider the following hypothetical:

> I'd like for you to take a hypothetical, if you would. A person who
> is 52 years old on her alleged onset date of 1/1/02. She's now 59.
> Date last insured is '06. And at 52 and she has a 12th grade
> education[,] [a]nd the past relevant work as indicated. . . .
> Suffering from some osteoarthritis, and/or inflammatory arthritis,
> and/or psoriasis arthritis. But she does have some COPD. She still
> smokes . . . . And she has some heart trouble and obesity. She
> weighs 204 pounds. . . . But she did have some moderate pain and
> discomfort in hands, knees, back, and hips. Shortness of breath on
> over exertion. Some occasional chest pain, according to her
> testimony, somewhat relieved by medication without significant
> side [e]ffects. But she believed she had some lightheadedness and
> drowsiness from one or a combination during the period. And if I
> find, Mr. Malansen, that she needed to have jobs at, in the SVP
> range of three, four, or five due, due to her pain and discomfort
> during the period in question. And if I find that she can lift 10
> pounds frequently, 20 on occasion. Sit for an hour, stand for an
> hour consistently. And would have to avoid heights and hazardous
> machinery due to drowsiness perhaps and temperature and
> humidity extremes. But with those limitations would seem to be
> able to have done sedentary, light work activities. Would she be
> able to have done any of her past work with those limitations?

(Tr. at 54–56) Malansen testified that this hypothetical individual would be able to perform the

three jobs that Hall had previously held (as a bookkeeper and both positions as a salesperson).

(*Id.* at 56)

---

[5]     "SVP" stands for "specific vocational preparation," and is a measure of the
amount of a time required to learn the skills and satisfy the requirements to perform the type of
work under consideration. *See, e.g., Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir.
2010).

In addition, the ALJ asked Malansen whether, if such an individual was found to be unable to perform those previous jobs and could not perform continuous gross or fine manipulation due to an arthritic condition, there were any other jobs classified as unskilled or semi-skilled that the person could perform. (Tr. at 56) Malansen said that there were two such unskilled jobs in the "light" work category. First, he said that the individual could be a general office worker (SVP 4). (*Id.* at 57) He testified that there were approximately 2,800 of these positions in the local region (defined as being within a 75-mile radius from Dover, Delaware), and about 400,000 of these positions in the national economy. (*Id.*) The second such position was that of light office helper (SVP 2). (*Id.*) Malansen testified that there are about 1,200 of these positions locally, and about 140,000 nationally. (*Id.* at 58) These jobs would require very little vocational adjustment in light of Hall's prior work. (*Id.*)

On cross-examination by Hall's attorney, Malansen testified that if a person could not stand or walk for more than two hours per day, then she could not perform any of Hall's prior jobs, but could perform the jobs of general office worker and light office helper. (Tr. at 58–60) To perform these jobs, the person would generally need to be available for an eight-hour work day (with breaks and lunch factored in). (*Id.* at 62–63) Malansen said that if the hypothetical person had an angina attack once a week, which would require her to take a nitroglycerin pill and rest for 15 to 20 minutes, this could affect whether an employer would retain her. (*Id.* at 64)

### 3. The ALJ's Findings

On September 8, 2009, the ALJ issued the following eleven findings:[6]

1. The claimant last met the insured status requirements of the Social Security Act on

---

[6]     *See* Tr. at 11–26.

December 31, 2006.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2002 through her date last insured of December 31, 2006 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: chronic obstructive pulmonary disease, osteoarthritis, psoriatic arthritis, coronary artery disease and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could lift 20 pounds occasionally, 10 pounds frequently, sit for one hour, stand for one hour consistently on an alternate basis 8 hours a day, 5 days a week for a 40 hour work week avoiding heights and hazardous machinery and temperature and humidity extremes.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 2, 1949 and was 57 years old, which is defined as an individual of advanced age, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

15

9. The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2002, the alleged onset date, through December 31, 2006, the date last insured (20 CFR 404.1520(g)).

Hall's challenge to the ALJ's decision focuses largely on Finding No. 5, where the ALJ determined Hall's RFC.

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations and internal quotation marks omitted). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005).

### B.    Review of ALJ Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has explained that substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotation marks omitted). The United States Court of Appeals for the Third Circuit has also held that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). "Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.*

In analyzing whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *Monsour*, 806 F.2d at 1190–91. The Court's review is limited to the evidence that was actually presented to the ALJ. *Matthews v. Apfel*, 239 F.3d 589, 593–95 (3d Cir. 2001).

Thus, the Court's inquiry is not whether the Court would have made the same determination as the Commissioner; instead, the question is whether the Commissioner's conclusion is reasonable. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1983). Even if the reviewing Court would have decided the case differently, it must defer to the ALJ and affirm the

17

Commissioner's decision if it is supported by substantial evidence. *Monsour*, 239 F.3d at 1190–91.

## III.  DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that she was disabled prior to the date she was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in

18

substantial gainful activity. *Id.* at § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *Id.* at § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are "presumed severe enough to preclude any gainful work." *Plummer*, 186 F.3d at 428; 20 C.F.R. § 404.1520(a)(4)(iii). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is found to be disabled. *Id.* If a claimant's impairment, either by itself or in combination, fails to meet or medically equal any listing, the Commissioner should proceed to steps four and five. *Id.* at § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (citation and internal quotation marks omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when

19

the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a vocational expert. *Id.*

## B. Ms. Hall's Arguments On Appeal

On appeal, Hall presents two principal arguments: (1) the ALJ failed to properly evaluate her subjective complaints of pain when assessing her RFC; and (2) the testimony of the vocational expert was deficient. (D.I. 18 at 13–19) As is discussed below, the Court finds that neither argument provides a reason to depart from the ALJ's decision, given that substantial evidence supports the ALJ's findings. In particular, the evidence of record indicates that the ALJ's assessment of Hall's subjective complaints was reasonable, and that he made a credibility determination supported by substantial evidence. His findings were then appropriately reflected in his questioning of the vocational expert.

### 1. Whether the ALJ Properly Evaluated Ms. Hall's Subjective Complaints of Pain When Assessing Residual Functional Capacity

Hall challenges the ALJ's determination of her RFC, arguing that he failed to properly evaluate her subjective complaints of pain and that, as a result, he improperly assessed her RFC. (D.I. 18 at 13) Although Hall's challenge to the ALJ's finding is nominally directed to his RFC

20

determination, this argument is actually, in significant part, a challenge to the ALJ's credibility determination. In response, the Commissioner contends that the ALJ appropriately considered Hall's subjective complaints of pain, and that he rightly concluded that Hall's statements regarding the intensity, persistence, and limiting effect of her pain were not entirely credible. (D.I. 20 at 13 (citing Tr. at 24–27))

### a. Legal Guidelines Regarding Evaluation of Ms. Hall's Pain

Social Security regulations establish a two-part process that an ALJ must follow when assessing subjective symptoms. First, in evaluating a claimant's statements about pain, an ALJ must identify "medical signs and laboratory findings which show that [a plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain . . . alleged." 20 C.F.R. § 404.1529(a); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). Conversely, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also id.* at § 404.1528(a) ("[The claimant's] statements alone are not enough to establish that there is a physical or mental impairment."). Instead, while a claimant's "statements about the intensity and persistence of [her] pain or other symptoms" must be given serious consideration, those statements must also "reasonably be accepted as consistent with the medical signs and laboratory findings." *Id.* at § 404.1529(a).

Second, if the ALJ finds that there is objective medical evidence that could reasonably be expected to produce the claimant's expressed pain symptoms, then the ALJ must evaluate the nature and persistence of the subjective symptoms and the extent to which those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1); *Johnson v. Astrue*, Civil Action No.

21

09-023-LPS, 2011 WL 4498948, at *10 (D. Del. Sept. 27, 2011). When complaints of pain are supported by medical evidence, "the complaints should then be given great weight and may not be disregarded unless there exists contrary medical evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067–68 (3d Cir. 1993) (citation and internal quotations omitted).

On the other hand, at this second stage, the ALJ need not unquestioningly accept the claimant's assertions as to the nature and persistence of her pain. To the contrary, an ALJ may reject the claimant's testimony in this regard if he does not find it credible, so long as the reasons for the ALJ's credibility finding are grounded in the evidence and articulated in his decision. *See Johnson*, 2011 WL 4498948 at *10 (citing SSR 96-7p, 1996 WL 374186, at *4–5); *Wimbley v. Massanari*, No. CIV. A. 99-616-GMS, 2001 WL 761210, at *6 (D. Del. Jun. 21, 2001) (noting that an ALJ retains the discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of the medical findings and other evidence regarding the true extent of the pain alleged by the claimant") (citation and internal quotation marks omitted). This necessarily requires the ALJ to decide the extent to which the claimant "is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft*, 181 F.3d at 362. In making this determination, the ALJ can weigh such factors as the claimant's daily activities; location, frequency, and intensity of the pain and other symptoms; precipitating or aggravating factors; effectiveness and side effects of medication the claimant takes; and measures that the claimant uses to relieve pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3). Evidence of a claimant's failure to take medication or seek treatment may also be considered when assessing the severity or extent of pain. *Mason*, 994 F.2d at 1068.

An ALJ's credibility determination is entitled to deference and should not be discarded

lightly, particularly given the ALJ's opportunity to observe an individual's demeanor. *Reefer v.*

*Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). "Credibility determinations are the province of the

ALJ and only should be disturbed if not supported by substantial evidence." *Gonzalez v. Astrue*,

537 F. Supp. 2d 644, 657 (D. Del. 2008) (citation and internal quotation marks omitted).

**b.      The ALJ's Findings Regarding Ms. Hall's
        Subjective Complaints of Pain and Their Resulting Impact on
        the RFC Determination**

The ALJ found that Hall suffered from five severe impairments: (1) chronic obstructive

pulmonary disease, (2) osteoarthritis, (3) psoriatic arthritis, and (4) coronary artery disease and

(5) obesity. (Tr. at 11, 19) The ALJ determined that "a number of [these] impairments could

reasonably cause *some* symptomatology." (*Id.* at 19 (emphasis added)) However, he noted that

"the pivotal question [was] whether . . . those symptoms occur with *such frequency, duration or*

*severity* as to reduce the claimant's [RFC] or to preclude all work activity on a continuing and

regular basis." (*Id.* (emphasis added))

As previously noted, Hall testified that she suffered from pain in her fingers, wrists,

knees, hips, and back, which affected her daily life, including her ability to grip objects and to

climb stairs. (Tr. at 33, 48–50) Hall also asserted that during the period of claimed disability,

she had chest pain that produced a squeezing feeling in her chest when she would go up steps or

exert herself. (*Id.* at 31) She further testified how, at some point prior to 2007, she would have

angina attacks three or four times a week that affected her breathing. (*Id.* at 37–38) And she

noted that prior to 2007, she could lift only 10 pounds without strain, could stand for about a half

hour at a time, could walk about a half block at a time (with rest during the walk), and could sit

for about an hour-and-a-half at a time. (*Id.* at 47–49) In all, Hall claimed that her pain and

related physical limitations rendered her unable to work during the period of claimed disability.

The ALJ considered Hall's testimony in this regard, but ultimately concluded that it was "not consistent with the medical record as a whole." (Tr. at 19) The ALJ determined that "the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by the claimant." (*Id.*) This conclusion contributed to the ALJ's finding that through the date last insured, Hall "had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could lift 20 pounds occasionally, 10 pounds frequently, sit for one hour, stand for one hour consistently on an alternate basis 8 hours a day, 5 days a week for a 40 hour work week avoiding heights and hazardous machinery and temperature and humidity extremes." (*Id.* at 18) Ms. Hall objects to these findings on multiple bases, which the Court will consider in turn.

**(1)    The ALJ's Analysis of Ms. Hall's Subjective Complaints of Pain**

Hall first makes a general argument against the ALJ's RFC determination, asserting that "[s]ince pain is subjective no objective test or imag[ing] study can measure pain. It is simply beyond the ability of anyone to be able to say a specific finding on a particular test amounts to a specific level of pain." (D.I. 18 at 13) In support of this argument, Hall cites the Third Circuit's opinion in *Green v. Schweiker*, 749 F.2d 1066 (3d Cir. 1984), for the proposition that a claimant's complaints of pain must be "seriously considered" in the ALJ's evaluation process and that they may bolster a disability claim when they are supported by the accompanying medical evidence. (D.I. 18 at 13)

Hall's argument could be read to suggest that it is impossible for an ALJ to make any

clear link between a claimant's subjective complaints about the extent of pain and the objective

evidence, and that, as a result, any attempt by the ALJ to do so here was error. Such an argument

would contravene the law. As the *Schweiker* Court acknowledged, a plaintiff's subjective

complaints of pain will not "alone" establish that a plaintiff is disabled. *Schweiker*, 749 F.2d at

1069–70 (noting that subjective complaints of pain "do not in themselves *constitute* disability")

(emphasis in original). Instead, as explained above, the ALJ is required to attempt to identify

medical evidence in the record that could be reasonably expected to produce Hall's alleged pain

symptoms. *See* 20 C.F.R. § 404.1529(a). And if that connection is made (as the ALJ found it

was in this case), the ALJ must then evaluate the intensity and persistence of the claimant's pain,

by examining *both* objective medical evidence (such as evidence submitted by physicians,

laboratory results, and other medical records) and other evidence about the claimant (such as the

claimant's daily activities and her own statements). *See id.* at § 404.1529(a), (c). Indeed, in

*Schweiker*, the Third Circuit upheld an ALJ's finding that a claimant's testimony about her pain

was not an "accurate index" of her condition because it was contradicted by the medical evidence

of record, and was therefore "not credible in regard to the severity, duration [or] frequency of

such symptoms." 749 F.2d at 1070.

    In light of these legal requirements, any argument asserting that a claimant's complaints

of pain should be given essentially irrefutable status in the disability calculus is clearly at odds

with established law. *See e.g., Wimbley*, 2001 WL 761210 at *6.[7]   At each stage of the

---

[7]     Hall also notes that a portion of the Commissioner's regulations state that in
examining a claimant's expressed pain symptoms, the Commissioner will not "reject [a
claimant's] statements about the intensity and persistence of [the] pain . . . or about the effect [it]
[has] on [a claimant's] ability to work solely because the available objective medical evidence
does not substantiate [the claimant's] statements." (D.I. 18 at 14 (citing 20 C.F.R. §

evaluation process, the ALJ is required to closely examine such complaints in order to determine whether a claimant "is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft*, 181 F.3d at 362. While this may be a difficult exercise, that difficulty does not require that, at any stage, the ALJ must blindly accept the claimant's assertions.

Hall further generally asserts that in analyzing her arthritis, coronary artery disease, and COPD (and related health problems), "the ALJ did not consider and rejected evidence from Ms. Hall and her physicians regarding the intensity and persistence of her pain on the basis that 'objective test results and imaging studies do not correspond with her reported pain levels.'" (D.I. 18 at 14 (citing Tr. at 19)) To the contrary, the ALJ's decision indicates that he appropriately and thoroughly analyzed both Hall's subjective complaints of pain and medical reports from her physicians about that pain.

For example, the ALJ first considered the evidence relating to Hall's arthritic pain. He noted that in her testimony, Hall claimed that by 2006, this pain had worsened to the point where she could no longer ascend or descend the stairs in her home. (Tr. at 19; *see also id.* at 33) He reviewed the "objective test results and imaging studies," Hall's self-reported levels of pain, and the "good results" that she achieved after beginning treatment with Balacet in December 2006. (*Id.* at 19) The ALJ further noted that twice in late 2006, Hall rated her pain at the relatively low level of 2 out of 10, which supports his conclusion that Hall's pain was not as severe as she

404.1529(c)(2)) However, this portion of the regulations does not require that, in such a situation, the ALJ must uncritically accept the claimant's assertions as to the level and extent of her pain. Instead, the ALJ should consider other types of evidence (such as evidence regarding a claimant's daily activities, pain symptoms, or measures used to alleviate pain) in coming to a final conclusion as to whether a claimant is disabled. The ALJ did so in this case, as is more fully discussed below.

claimed at the hearing. (*Id.* at 19–20) And with respect to Hall's arthritic hand pain stemming from a prior tendon surgery, the ALJ reviewed various objective imaging studies of Hall's hand pain, as well as Hall's own statements to her doctors, before finding that while Hall "did experience pain and discomfort," Hall's "ability to use her hands to perform functional activities is not as limited as she maintains." (*Id.* at 21)

The ALJ also considered the two stenting procedures (one in February 2005, and one in 2006) that Hall underwent as a result of her coronary artery disease. (Tr. at 20) The ALJ noted that Hall was experiencing chest discomfort, shortness of breath on exertion, and radiating pain, prior to receiving her first stent, but also that Hall's symptoms resolved after the first procedure. (*Id.*) Specifically, Dr. Milak noted that Hall was doing much better after catheterization, and was no longer having chest pain or shortness of breath. (*Id.* at 15; 394) The ALJ also considered the second stenting procedure, which occurred after a myocardial infarction in mid-2006. Again, Hall's symptoms reduced after the procedure, and later tests supported the conclusion that her condition had stabilized. (*Id.* at 20, 376, 517); *see, e.g.*, *Schoy v. Astrue*, Civil Action No. 06-537-GMS/MPT, 2008 WL 2474270, at *10 (D. Del. June 17, 2008) (affirming the ALJ's determination that claimant's pain was not as severe as claimant alleged, in part because less than two months after the diagnosis of claimant's degenerative joint disease, claimant told the doctors that his pain was "better").

Moreover, the ALJ also considered the improvements that Hall's pulmonary function (relating to her COPD) had shown over time. When she was first referred to Dr. Birnbaum in October 2005, Dr. Birnbaum indicated that he believed Hall's COPD was "moderate-to-severe." (Tr. at 12; *see also id.* at 470) But by April of 2006, Dr. Birnbaum had downgraded his diagnosis

27

from "moderate-to-severe" to "moderate," and noted that Hall had improved since adding Spiriva and Advair. (*Id.* at 12; *see also id.* at 467) Roughly one year later, Dr. Birnbaum again downgraded Hall's diagnosis from "moderate" to "mild" COPD, and even discontinued one medication that was no longer necessary due to her improving conditions. (*Id.* at 12; *see also id.* at 463) The ALJ noted that these improvements were inconsistent with someone experiencing a disabling level of chest pain or other impairments from COPD. (*Id.* at 22)

The ALJ also catalogued and considered Hall's description of her daily activities, noting that her Adult Function Report "indicat[ed] that she was able to pay bills, count change, handle a savings account and use a checkbook." (Tr. at 20) Hall was able to read, watch television, and listen to music, and reported no difficulties concentrating, understanding, following instructions, or with her memory. (*Id.*) The ALJ also highlighted Hall's testimony that during the relevant period she could lift 10 pounds stand for 30 minutes, and could sit for about 90 minutes without having to get up and move.[8] (*Id.* at 21; *see also id.* at 48–49); *see Schoy*, 2008 WL 2474270 at *11 (highlighting the ALJ's consideration of plaintiff's daily activities, including the plaintiff's ability to walk and stand, in the disability calculus).

The ALJ also considered the fact that Hall failed to take several actions prescribed by her physicians. First, several of Hall's doctors recommended that she stop smoking, but she continued to smoke throughout the relevant period. (Tr. at 21; *see also id.* at 463) Second, the ALJ noted that Dr. Ratain advised Hall to begin occupational and physical therapy along with

---

[8]      This description contrasted with Hall's statement about the nature of her condition at the time of the hearing, when she testified that she experienced pain with standing and spent nearly all of most days in bed or in a recliner. (Tr. at 39) The ALJ found that this testimony reflected Hall's then-current functional abilities, not (in light of the record evidence) her functional abilities during the period of claimed disability. (*Id.* at 21)

paraffin baths and ThermaCare wraps to ameliorate her arthritic condition. (Tr. at 13–14, 21) It appears that Hall failed to follow any of this medical advice, which, in the view of the ALJ, "[did] not add to the persuasiveness of [Hall's] subjective complaints." (*Id*. at 21) In other words, the ALJ found that if Hall's pain was really as severe as she claimed, then Hall would have done everything she could have to alleviate that pain—including curtailing her smoking and pursuing the recommended therapies. *See Mouser v. Astrue*, 545 F.3d 634, 638 (8th Cir. 2008) (noting that the failure to stop smoking should be considered as part of credibility determination as to extent of claimant's pain and limitations, where smoking could affect the impairments at issue); *Bertsch v. Astrue*, No. CA 07-421 ML, 2009 WL 1648907, at *9 (D.R.I. June 10, 2009) (same) (citing cases); *see also Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008) (finding that failure to attend therapy appointments could support adverse credibility finding against claimant regarding his complaints of pain); *Routh v. Astrue*, 698 F. Supp. 2d 1072, 1078 (E.D. Ark. 2010) (same).

As the foregoing discussion indicates, contrary to Hall's contention, the ALJ did not simply "reject," without consideration, evidence of Hall's subjective complaints of pain or the reports of her doctors when making his RFC determination. (D.I. 18 at 13) Instead, the ALJ weighed that evidence carefully, and, in so doing, determined that Hall's hearing testimony about the extent of her pain was not entirely credible. While Hall disagrees with the ALJ's conclusion,[9]

---

<sup>9</sup>        As noted above, the ALJ's credibility determination is entitled to substantial deference, "particularly in light of the [ALJ's] opportunity to assess the claimant's demeanor at the hearing." *Johnson*, 2011 WL 4498948 at *10. Thus, even if the Court would have reached a different credibility determination, "the court's task is not to re-interpret the record but merely to decide whether [the ALJ's] credibility determination, in the face of conflicting evidence, is supported by substantial evidence." *Wimbley*, 2001 WL 761210 at *7.

the Court finds that, as outlined in the preceding subsections, the objective medical evidence from Hall's treating physicians, Hall's own statements regarding her levels of pain, and Hall's own description of her daily activities amount to substantial evidence in support of the ALJ's credibility determination. *See Hartranft*, 181 F.3d at 362 (affirming an ALJ's credibility determination where the "ALJ cited specific instances" where the claimant's subjective complaints of pain were inconsistent with objective medical evidence, the claimant's hearing testimony, and claimant's description of his daily activities).

### (2)    Ms. Hall's Additional Specific Objections to the ALJ's Findings Regarding Her Complaints of Pain and Her RFC

Hall also challenges the ALJ's decision on five other specific grounds relating to the ALJ's assessment of her complaints of pain and/or her RFC.

First, Hall argues that the ALJ "selectively cited evidence supporting his conclusion that Ms. Hall was not disabled and ignored evidence which conflicted with it." (D.I. 18 at 15) For example, she asserts that the ALJ "stated that Ms. Hall told Dr. Ratain that her pain level on one day was 2 [out of] 10, but did not consider that Ms. Hall[] was having a good day and that her pain [wa]s variable." (*Id.*)

The record does indicate that when Hall visited Dr. Ratain in December 2006, she cited her pain on that day as a "2 out of 10," but also noted that "[t]oday is a good day," and that for 3 to 4 prior days she "could not move." (Tr. at 432) However, the ALJ's examination of the scope and limiting effect of Hall's arthritis pain went beyond a review of one report on one day. He noted that Hall had given the same report of pain ("2 out of 10") when she saw Dr. Ratain months earlier in September 2006 and that he had not seen evidence in the record of Hall ever

30

reporting a higher pain level on such a scale. *(Id.* at 13, 19) The ALJ also emphasized that other medical records supported his conclusion that Hall's arthritic pain, while present, was manageable, including: (1) her ability to complete household tasks and to concentrate on her surroundings; (2) diagnoses by Dr. Ratain indicating that her arthritis was "mild" and allowed her to curl her fingers; (3) evidence that her pain was reduced through medication; and (4) her decision to decline to engage in physical and occupational therapy that had been recommended by Dr. Ratain. *(Id.* at 19–21) Further corroborating the ALJ's conclusion in this regard is the fact that none of Hall's treating physicians ever recommended limiting her work in any manner, *(id.* at 21), and that by September of 2006, Hall herself noted that her pain had subsided to the point that it was "not daily" *(id.* at 435).

Given the nature of pain, it is not surprising that Hall would have identified her arthritis pain as feeling better on certain days. *Perez v. Barnhart,* 415 F.3d 457, 465 (5th Cir. 2005) ("It is axiomatic that the pain from any type of ailment will vary in intensity, especially the farther one gets from treatment that alleviates pain."). But contrary to the suggestion in Hall's briefs, the ALJ's findings as to the scope of Hall's arthritis pain were nuanced, not one-sided. The ALJ found that Hall "did experience pain and discomfort as a result of her arthritis," but simply concluded that in light of the overall state of the record, as discussed above, that pain was not as severe as Hall claimed. (Tr. at 21) In light of the many portions of the record that support the ALJ's conclusion, the Court finds that the ALJ's reference to the December 2006 visit with Dr. Ratain was not an instance of selective citation; instead, it was one piece of evidence supported by a larger whole.

Second, Hall argues that the "good results" she enjoyed from treatment with Balacet for

31

arthritis pain—another fact cited by the ALJ in support of his conclusion regarding Hall's pain—was not "credible evidence that [she] is not disabled from her impairments." (D.I. 18 at 15; D.I. 21 at 3) Hall cites *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429 (3d Cir. 1999), in support of this charge. However, *Schaudeck* does not support Hall's argument, as that case involved very different circumstances from those at play here.

In *Schaudeck*, the claimant alleged that an ALJ erred when he found—in step three of the five-step inquiry—that the claimant's Hodgkin's Disease did not meet or equal in severity any of the impairments listed in Subpart P of Part 404 of the applicable Social Security regulations. 181 F.3d at 432. One of the impairments so listed is "Hodgkin's Disease . . . not controlled by prescribed therapy." *Id.* (citing 20 C.F.R. Pt. 404, Sbpt. P, App. 1, § 13.06A). In finding that the claimant's disease did not meet any of the listed impairments, the ALJ in *Schaudeck* relied on the report of a non-treating physician, who stated that the claimant was "responding to her treatment." *Id.* (quotation marks omitted). Thus, the question was whether, for purposes of *step three* of the five-step inquiry, the phrase "responding to" contained in a medical report was equivalent to the phrase "controlled by" used in the regulations. *Id.* The Court held that "control," as used in the description of Hodgkin's Disease in the regulations, "means that the treatment has been so successful that the disease can be considered effectively neutralized." *Id.* *Schaudeck* did not hold that in *step four* of the inquiry (which is where the ALJ here considered evidence of Hall's "good results" with Balacet, *see* Tr. 19), all evidence of the clinical effect of medication must be disregarded or deemed not "credible," as Hall contends. In fact, such a result would be antithetical to the Commissioner's regulations, which require that in evaluating a claimant's complaints of pain, an ALJ expressly take into account the "effectiveness . . . of any

32

medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain." *See* 20 C.F.R. § 404.1529(c)(3)(iv).

The ALJ was entitled to take into account evidence of Hall's response to medication. This sort of evidence has routinely been considered when evaluating alleged disability. *See, e.g., Matthews v. Barnhart*, 108 F. App'x 986, 987 (5th Cir. 2004) (affirming an ALJ's denial of DIB where the claimant's condition "was being successfully treated through medication and his occasional flare-ups responded well to injections of anti-inflammatory and pain-relieving drugs"); *Barnhill v. Astrue*, 794 F. Supp. 2d 503, 516 (D. Del. 2011) (affirming ALJ's decision to reject the opinion of claimant's physician, who had opined that claimant's lower back pain would prevent her from performing sedentary work, in part due to fact that physician's notes showed that claimant had reported "improvement in her pain levels with medication"); *Thomas v. Barnhart*, 469 F. Supp. 2d 228, 237 (D. Del. 2007) (upholding ALJ's determination that claimant's symptoms from headaches did not amount to a disability, in part due to evidence showing that headaches improved with medication).

Third, Hall faults the ALJ's reliance, in his assessment of the limitations placed on Hall by her pain, on the fact that in 2007, Hall was able to do things like pay bills, count change, handle a savings account, use a checkbook, read, watch television, and listen to music. (D.I. 18 at 15; Tr. at 20) Hall does not dispute that she was also able to do these activities during the period of claimed disability, but instead argues that these facts are "not credible evidence that an individual retains the capacity to work 40 hours per week at a job" because "[r]eading, watching tv or listening to music occasionally has no bearing on the ability to perform work tasks on a full-time basis." (D.I. 18 at 15)

Hall's objection may have had greater import were these the only facts that the ALJ took into account in making an assessment of Hall's pain levels and her RFC. However, as noted above, the ALJ considered a multitude of factors in coming to this assessment; Hall's ability to engage in daily activities was simply one of those factors. And certainly, the ability to focus on and perform common household tasks is *relevant* to a determination of disability, given that the regulations specifically identify a claimant's "daily activities" as one of the factors to be considered in assessing the severity of the claimant's pain. *See* 20 C.F.R. § 404.1529(c)(3)(i); *see also Wood v. Barnhart*, No. Civ.05-0432 SLR, 2006 WL 2583097, at \*10 (D. Del. Sept. 7, 2006) (finding evidence regarding claimant's ability to watch television and read to be relevant to credibility determination regarding limits of claimant's functional capacity). Were Hall's pain so significant that she were unable to regularly engage in these common activities, for example, that might be a strong indicator that she was, in fact, disabled during the relevant period. Conversely, here the fact that Hall *was* able to perform these activities without great difficulty was one piece of relevant evidence suggesting to the ALJ that the extent of her pain was not so great or so disabling as to prevent her from working at a level contemplated by the RFC. Understood in that context, the Court can find no error in the ALJ's use of this evidence as a factor in his analysis.

Fourth, Hall argues that the ALJ "rejected the opinion of its own state agency consult who found that Ms. Hall was limited to sedentary work." (D.I. 18 at 15) Hall is referring to the findings of Dr. Vinod Kataria, a state agency medical consultant, who examined Hall and concluded that she could lift 10 pounds occasionally, lift less than 10 pounds frequently, stand and/or walk for at least 2 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. (Tr. at 454) These conclusions would have imposed greater work-related limitations

34

on Hall than those contemplated by the ALJ's RFC determination. (*Id.* at 18)

Contrary to Hall's contention, the ALJ did not reject Dr. Kataria's findings outright. The ALJ's decision specifically notes that he "assign[ed] some weight to Dr. Kataria's opinion." (Tr. at 24) In particular, the ALJ assigned weight to Dr. Kataria's finding that Hall could sit for 6 hours in an 8 hour day, so long as she avoided temperature extremes, humidity, and hazards. (*Id.*) However, the ALJ found that:

> Dr. Kataria's remaining [findings regarding] limitations involving lifting 10 pounds occasionally, less than 10 pounds frequently, standing and walking for 2 hours in an 8 hour day, climbing a ladder, rope or scaffold and avoiding concentrated exposure to wetness, fumes, odors, dust, gases and poor ventilation are assigned little weight. The claimant was found to have mild osteoarthritis in her hands through imaging studies performed 27 days prior to the date last insured . . . . In addition, Dr. Ratain did not diagnose the claimant with an inflammatory process up through December 2006. These findings would not preclude the claimant from climbing a ladder, rope or scaffold or from lifting over 10 pounds and standing and walking for a total of 6 hours. Further, the claimant's [COPD] responded well to treatment causing Dr. Birnbaum to discontinue treatment with one drug in June 2007 . . . . He subsequently reduced the claimant's diagnosis to mild [COPD]. These findings do not support a limitation involving avoiding concentrated exposure to fumes, odors, gases and poor ventilation or wetness.

(*Id.*) Hall contends that this "rejection" of most of Dr. Kataria's findings was improper because the ALJ referred only to evidence relating to Hall's hands when discussing Dr. Kataria's assessment. (D.I. 18 at 16) She argues that because one aspect of Dr. Kataria's findings—his conclusion that Hall could not walk more than 2 hours in a given workday—does not directly relate to hand pain, the ALJ's rejection of Dr. Kataria's findings is invalid and the assessment should instead have been given "substantial weight." (*Id.*)

35

However, the ALJ did not only cite evidence relating to Hall's hand pain when analyzing the weight to be given to Dr. Kataria's findings. Rather, the ALJ cited to Dr. Ratain's December 5, 2006 examination, which focused not only on Hall's hands, but also her wrists, elbows, shoulders, neck, spine, hips, knees, and ankles. (Tr. at 24) During this extensive examination, Dr. Ratain found no evidence of "an inflammatory process." (*Id.* at 432) Specifically, Dr. Ratain found no evidence of inflammation in either "the hands [or] knees," "good movement" of the knees and "full movement" of the hips during the musculoskeletal examination. (*Id.* at 432–33)

Moreover, in addition to Dr. Kataria's findings, the ALJ also received an RFC assessment from Dr. William D. Hakkarinen, another state agency medical consultant.[10] Dr. Hakkarinen concluded, *inter alia*, that Hall could lift 20 pounds occasionally, 10 pounds frequently and stand or walk for 6 hours in an 8 hour day. (Tr. at 22, 492) These limitations were less severe than those contained in Dr. Kataria's opinion, and the ALJ relied on them to find that Hall's RFC included the ability to lift "20 pounds occasionally, 10 pounds frequently [and] sit for one hour [and] stand for one hour consistently on an alternate basis 8 hours a day, 5 days a week for a 40 hour work week. . . ." (*Id.* at 18; *see also id.* at 23) When an ALJ is presented with findings from two different physicians who reach different conclusions as to a claimant's RFC, the ALJ is entitled to weigh these conflicting findings and choose one over the other, so long as there is a reasoned basis for doing so. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) (affirming that

---

[10]     The ALJ notes that a third physician, Oluseyi Senu-Oke, M.D., examined Hall and completed a Physical Residual Functional Questionnaire in May 2009. (Tr. at 23) However, the ALJ also explained that Dr. Senu-Oke did not begin treating Hall until after the period of claimed disability ended. (*Id.*) In light of this and the other evidence in the record, the ALJ concluded that Dr. Senu-Oke's conclusions as to Hall's limitations were not reflective of the extent of Hall's limitations within the period of claimed disability. (*Id.*) Hall does not challenge this finding on appeal.

an "ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw [his] own inferences") (citation and internal quotation marks omitted); *Posko v. Astrue*, 756 F. Supp. 2d 607, 613 (D. Del. 2010) ("In evaluating medical reports, the ALJ is free to choose the medical opinion of one doctor over that of another . . . [so long as the ALJ does not do so] for no reason or for the wrong reason.") (citation and internal quotation marks omitted). Here, the ALJ made such a choice, and adopted the views of Dr. Hakkarinen instead of those held by Dr. Kataria. The results of Dr. Ratain's musculoskeletal examination and the additional portions of the medical record discussed previously, in conjunction with the extent of Hall's subjective complaints of pain, all provide substantial evidence supporting the ALJ's conclusion that Dr. Hakkarinen's assessment is more consistent with the overall record.

Fifth, Hall argues that the ALJ improperly rejected certain aspects of her hearing testimony, such as testimony (1) that her husband takes care of many of the household chores because she cannot and (2) about her difficulties in climbing stairs or accessing the bathtub. (D.I. 18 at 16 (citing Tr. at 21)) The ALJ noted this testimony in his decision, but found that the limitations described by Hall "reflect[ed] her current functional abilities and not her status during the relevant period [of claimed disability]." (Tr. at 21) In her brief, Hall argues that, in fact, the "hearing transcript clearly shows that Ms. Hall's testimony was limited to the period before 2007." (D.I. 18 at 16) In support of that point, Hall cites to particular parts of the hearing record where her counsel specifically indicated to Hall by his questions that he wanted Hall to address her limitations as they existed prior to 2007 (or prior to the end of the claimed period of disability on December 31, 2006). (*Id.* (citing Tr. at 35–37, 47, 48))

37

However, the portions of Hall's testimony at issue here occurred at a different part of the hearing. (Tr. at 38–40) In that portion of the hearing, the initial question from Hall's counsel that led to Hall's responses at issue (about her need for her husband's help around the home or her difficulties with stairs and the bathtub) was, at best, less than clear as to whether Hall should respond only regarding her status prior to 2007. (*Id.* at 38 ("Now back in, before 2007 and currently, and you can describe how it's changed, if it has at all, whether it's the same, but back before 2007 what did you do during the day? How did you spend your time?")) And counsel's follow-up questions to Hall on these topics were largely phrased in the present tense. (*Id.* at 39 ("Who *does* your shopping and things of that nature?") ("How about cleaning, who *does* the cleaning of the house?") ("*Taking* out the trash?") ("So how much *are* you, you think you're standing total?") (emphasis added)) This made it even less clear as to whether Hall's subsequent answers to these questions referred to the pre-2007 period of claimed disability, or to her circumstances at the time of the May 2009 hearing date. In light of this lack of clarity, and the record as a whole—including evidence that Hall's functional abilities declined after the claimed period of disability ended, (*id.* at 21)—the ALJ's conclusion that Hall's hearing answers reflected her status as of May 2009 (not prior to 2007) is supported by substantial evidence.

## 2.    The Alleged Deficiency in the Vocational Expert's Testimony

Lastly, Hall asserts that the testimony of vocational expert Tony Malansen was deficient. (D.I. 18 at 17; D.I. 21 at 4–5) Vocational expert testimony in disability determination proceedings often centers on a hypothetical question relating to whether the applicant could perform certain types of jobs, and the extent to which such jobs are found in the local and national markets. *Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir. 1984). "While the ALJ

may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id.* In posing a hypothetical question to a vocational expert, an ALJ "is *not required* to submit to the vocational expert every impairment alleged by the claimant," but rather need only include those "impairments which have been found to exist on the basis of *credible evidence.*" *Krolick v. Astrue*, Civ. No. 06–139–LPS, 2008 WL 3853401, at *10 (D. Del. Aug. 18, 2008) (emphasis added).

In this case, the ALJ asked Malansen whether a hypothetical person afflicted with certain ailments and physical limitations could perform any occupations. (Tr. at 54–56) Malansen responded that such a person could perform the jobs of general office worker and light office helper. (*Id.* at 57–58) The ALJ found that the limitations contained in the hypothetical question matched those that Hall suffered from during the claimed period of disability; therefore, he found that Hall could have performed these jobs and that she was not disabled. (*Id.* at 25–26)

Hall argues that the hypothetical question posed by the ALJ to the vocational expert did not accurately portray Hall's physical impairments because it "fail[ed] to include Ms. Hall's limited stamina, difficulties walking, angina, severe hand and wrist pain and limitations, and the variation of her symptoms over time." (D.I. 18 at 18) After reviewing the record, however, the Court finds that there is substantial evidence that the hypothetical question accurately portrayed Hall's condition, as all of the impairments that Hall identifies in her briefs were appropriately accounted for in that question.

As an initial matter, a careful reading of the hypothetical question shows that the ALJ did,

in fact, refer to several of the limitations that Hall claims were improperly disregarded. For example, although the hypothetical question did not specifically use the terms "limited stamina" or "difficulties walking," the ALJ did note in his question that Hall had "[s]hortness of breath on over exertion" and "moderate pain and discomfort in [her] knees, back, and hips." (Tr. at 55–56) Similarly, although the ALJ did not specifically reference the term "angina" in his hypothetical question, he did refer to Hall's "heart trouble" and to her "chest pain" that was only "somewhat relieved by medication."[11] (Id. at 55) These references, while not using the exact wording that Hall now identifies, fairly conveyed the relevant limitations associated with those terms. Hall has cited no authority requiring the ALJ to insert Hall's own characterizations of pain and other symptoms *in haec verba* into the hypothetical question; on the contrary, the Third Circuit has required only that the ALJ "accurately convey" any impairments that are "credibly established" by the record. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The Court finds that the hypothetical question "accurately conveyed" all of Hall's limitations relating to limited stamina, difficulties walking, and angina that were "credibly established."

Moreover, while the ALJ did not cite the "severe" hand pain that Hall mentions, he did refer to the "moderate pain and discomfort [that Hall had] in [her] hands" in the hypothetical

---

[11]     "Angina is chest pain or discomfort that occurs if an area of one's heart muscle does not get sufficient oxygen-rich blood. It can feel like pressure or squeezing in one's chest, or indigestion." *Smollins v. Astrue*, No. 11-CV-424 (JG), 2011 WL 3857123, at *1 n.3 (E.D.N.Y. Sept. 1, 2011) (citations omitted). Angina is often related to coronary artery disease, which involves the narrowing of the small blood vessels that supply blood and oxygen to the heart. *Id.* In this case, Hall's hearing testimony suggested that her complaints of angina were thought by her doctors to be merely manifestations of anxiety, though she disagreed with this diagnosis. (Tr. at 37) Yet even assuming that these complaints were related to Hall's heart problems, the ALJ did list coronary artery disease as one of a number of severe impairments that Hall suffered from in his decision. (*Id.* at 11) And, as noted above, the ALJ referred to that heart problem (and its corresponding effects) in his hypothetical question to the vocational expert.

question posed to the expert. (Tr. at 55) The ALJ did not refer to Hall's hand pain as "severe" because he had determined that Hall's allegations in this regard were not supported by credible evidence in the record. (*Id.* at 20–21) As noted above, the ALJ concluded that Hall was suffering from, at most, moderate pain in her hands, and in support of that conclusion he cited to multiple portions of the evidentiary record, including: (1) imaging studies performed on Hall in 2006 that showed only moderate osteoarthritis and no inflammatory process in the hands; (2) Hall's ability to curl her fingers without discomfort during an examination on September 11, 2006; and (3) Hall's testimony and statements to physicians regarding the limited scope of her pain and the positive impact that medication had on that pain. (*Id.*) Indeed, Hall testified that when it came to pain in her hands, she could "just deal with it," given that she was "used to it" and was able to "just work with it." (*Id.* at 50) As noted above, the Court finds that these citations provide substantial evidence to support the ALJ's conclusion as to the scope of Hall's hand pain. Therefore, the Court cannot conclude that the hypothetical question improperly referred to the nature of that pain. *See, e.g., Rutherford,* 399 F.3d at 555 (rejecting a claimant's challenge to a hypothetical question that omitted a specific reference to a "lack of manual dexterity" where the hypothetical question did refer to an individual who was capable of "not more than occasional handling and fingering with the right upper extremity"); *Nance v. Sullivan,* 955 F.2d 46, 1992 WL 28102, at *7 (7th Cir. 1992) (table decision) (finding no error in hypothetical question where ALJ identified the claimant's headaches and loss of grip as "mild," although the claimant testified that these conditions were more severe).

As to Hall's objection that the question did not account for the "variation of her symptoms over time," the question did in fact suggest some variation. The ALJ noted that Hall's

chest pain was "occasional," and "somewhat relieved by medication." (Tr. at 55) The ALJ also stated that Hall's "[s]hortness of breath," a symptom of her chest pain and/or COPD, occurred "on over exertion." (*Id.*) However, it appears that Hall's objection is primarily focused on the ALJ's failure to credit her allegations that she experienced regular episodes of severe pain. As discussed above, there was substantial evidence in the record to support the ALJ's decision on this point.

This case is thus distinguishable from *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984), the primary case relied upon by Hall in support of her challenge to the completeness of the ALJ's hypothetical question. (D.I. 15 at 16) In *Podedworny*, the ALJ did not mention two specific impairments—dizziness and blurred vision—in a hypothetical question to the vocational expert, referring generically instead to "a history of treatment for a variety of impairments." 745 F.2d at 218 (citation and internal quotation marks omitted). Here, in contrast, the ALJ's question included a specific recitation of all ailments that were credibly supported by the record evidence.

Hall makes two other arguments regarding the vocational expert's testimony. First, she asserts, without citing to any record evidence, that the "vocational expert testified that [the general office worker and light office helper jobs] required continual use of the hands which even the ALJ found Ms. Hall was not capable of performing." (D.I. 18 at 19) As an initial matter, while the vocational expert testified that "[c]ontinual use of the hands" is required for both the general office worker and office helper positions, (Tr. at 60), the ALJ noted in his decision that according to the Dictionary of Occupational Titles, both such positions require only "frequent, not constant, reaching, handling and fingering" (*id.* at 25). Hall does not challenge the ALJ's characterization of these jobs. And in any event, the ALJ never foundwq21 that Hall was

incapable of using her hands continuously during the relevant period. Instead, the ALJ concluded that "the claimant['s] ability to use her hands to perform activities is not as limited as she maintains." (*Id.*) The ALJ's RFC determination, while including certain postural and environmental limitations (*id.* at 18), includes no manipulative limitations that reflect a finding that Hall lacked the ability to "continual[ly]" use her hands (*id.*). Indeed, both state agency medical consultants who examined Hall found that no manipulative limitations (including those relating to handling and fingering) had been established. (*Id.* at 456, 494) This is consistent with the broader medical records, which indicate that Hall's reported levels of hand pain were relatively low, that she was, at least at times, able to curl her fingers without discomfort, that she experienced no inflammatory process in her hands, that she responded well to medication (including Balacet), and that she declined the opportunity to engage in physical therapy to address her alleged hand pain. (*Id.* at 20–21) Given this record, there is substantial evidence to support the ALJ's finding that in light of Hall's age, education, work experience, and RFC, she would have been able to perform at least the two jobs identified by the vocational expert during the period of claimed disability.

Second, Hall also alleges that at the hearing, she testified that "back in 2006 or before 2007" she had angina attacks three to four times a week, requiring her to take nitroglycerin tablets and to rest in order to relieve the symptoms, and asserts that the vocational expert found that these consequences would have been incompatible with employment. (D.I. 18 at 19; Tr. at 37) At the hearing, in response to questions from Hall's attorney, the vocational expert did testify that if a person's angina required that, once or twice per week, the person would have to stop working to take a nitroglycerin pill for 15 to 20 minutes or more, and the person's employer

knew that this resulted from an angina attack, this could lead to the employer "stop[ping] employment." (*Id*. at 64) However, in his findings, the ALJ concluded that Hall's testimony as to these limitations from angina referred to a period "prior to [Hall's 2005 and 2006 heart] catheterizations," and that after these procedures, her "symptoms . . . resolved to no greater than mild findings." (*Id*. at 20) Hall does not address that aspect of the ALJ's findings, which would support a conclusion of non-disability, and the Court cannot find that there is insubstantial evidence in the record to support it.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, Hall's motion for summary judgement is DENIED and the Commissioner's motion for summary judgment is GRANTED. An appropriate Order follows.

44